**In re OPTI–GAGE, INC., Debtor.**

**AMERITRUST COMPANY, N.A., Plaintiff,**

v.

**OPTI–GAGE, INC. et al., Defendants.**

**Bankruptcy No. 3–90–02798. Adv. 3–90–0143.**

United States Bankruptcy Court, S.D. Ohio, W.D.

April 5, 1991.

William A. Huddleston, Cincinnati, Ohio, Philip E. Langer, Dayton, Ohio, for plaintiff.

Richard L. Furry, Dayton, Ohio, for defendant.

John D. Squires, Donald F. Harker, III, Dayton, Ohio, for debtor.

Roger J. Makley and Ronald S. Pretekin, Dayton, Ohio, for Iain Auld.

Thomas R. Noland and Robert B. Berner, Dayton, Ohio, for Vladmir Lich and Vera V. Lich.

Jon M. Sebaly, Richard A. Setterberg, John T. Ducker, Dayton, Ohio, for William and Donna Cavender.

DECISION AND ORDER DENYING MOTION OF DEFENDANT IAIN AULD (DOC. # 14) TO DISMISS CERTAIN CROSS–CLAIMS OF DONNA CAVENDER AND WALTER CAVENDER AGAINST LICH, AULD, AND OPTI–GAGE; AND ORDER REQUIRING FILING OF ADDITIONAL MEMORANDA OF LAW WITH RESPECT TO WALTER CAVENDER'S CROSS–CLAIM AGAINST LICH AND AULD

WILLIAM A. CLARK, Bankruptcy Judge.

This matter is before the court upon the motion of Iain Auld (Doc. # 14) to dismiss,

in accordance with Fed.R.Civ.P. 12(b)(1), the cross-claims of Donna Cavender and Walter Cavender asserted against Iain Auld on the ground that the court lacks jurisdiction over the subject matter. This court has authority to render a decision with respect to the motion pursuant to 28 U.S.C. § 1334 and the standing order of reference entered in this district.

## PROCEDURAL POSTURE

On June 27, 1990, Walter and Donna Cavender filed an "Application for Removal to United States Bankruptcy Court," and offered the following information as background:

1) On March 28, 1989 Ameritrust Company, N.A., loaned $1.5 million to Opti–Gage, Inc. ("Debtor") which executed a cognovit note. The loan was secured by Debtor's equipment, inventory, receivables and other property;

2) Walter and Donna Cavender executed a personal guaranty of $400,000 for the loan, and Vladimir and Vera Lich also signed a $100,000 personal guaranty. In addition, the Lichs and Cavenders also executed open-ended mortgages on separate parcels of real estate to secure their guaranty agreements;

3) Opti–Gage defaulted on the cognovit note;

4) On April 17, 1990, Ameritrust filed suit against Opti–Gage in the Common Pleas Court of Montgomery County, Ohio, and Opti–Gage, by warrant of attorney, confessed judgment in the amount of $1,078,785.54. Opti–Gage also confessed judgment in favor of Ameritrust as to all remedies available to Ameritrust under the security agreement executed in connection with the above loan;

5) On May 18, 1990, Opti–Gage moved for relief from judgment, for a stay of execution of the judgment, and for the appointment of a receiver. It's motion was denied by the state court on June 12, 1990. The time to appeal this decision has not yet run, and the decision is not yet final;

6) Ameritrust's state court suit also requested a declaratory judgment against the Cavenders and Lichs that its rights under the guaranty agreements had become absolute and that it was entitled to its legal remedies against the collateral securing the guaranty agreements;

7) By agreed entry, Walter and Donna Cavender were granted until June 22, 1990 to answer or otherwise plead in the state court action;

8) On June 22, 1990, Opti–Gage filed a petition in bankruptcy pursuant to chapter 11 of the Bankruptcy Code with this court and listed the Cavenders as creditors in the amount of $259,197.00.

On July 6, 1990 the Cavenders filed an "Answer, Counterclaim, and Crossclaim" [1] in this court in which they deny the validity and enforceability of the guaranty agreement delivered to Plaintiff Ameritrust Company. In their cross-claim against the debtor, Opti–Gage, the Cavenders seek judgment on a note executed by the debtor in favor of the Cavenders in the amount of $208,197; $51,480 as part of a stock purchase agreement; $27,000 under a consulting agreement; and $42,000 as part of a covenant not to compete.

## CROSS–CLAIMS AGAINST LICH, AULD, AND OPTI–GAGE

The cross-claims of the Cavenders against Lich, Auld, and Opti–Gage are based on the following allegations of the Cavenders:

Walter Cavender was the sole owner of Opti–Gage, a company engaged in the business of manufacturing, distributing and selling circuit boards.[2] In September of

---

1. In fact, Walter Cavender and Donna Cavender each filed a separate "Answer, Counterclaim, and Crossclaim." Although the contents of the pleadings are not identical, they are substantially similar and for purposes of ruling on the motion to dismiss will basically be treated as one pleading, with the major exception of Walter Cavender's cross-claim against Lich and Auld only.

2. At all relevant times Donna Cavender owned the real property on which the business of Opti–Gage was situated and leased the premises to Opti–Gage until June 8, 1990.

1988, Lich and Auld, who were previously unknown to the Cavenders, began discussions with Walter Cavender concerning the purchase from Walter Cavender of a controlling stock interest in Opti–Gage and of the Cavenders' machinery and equipment. Lich and Auld represented to the Cavenders that they had extensive business experience in companies such as Opti–Gage, that they intended to acquire other circuit board manufacturing companies, and that they had considerable cash resources available to them, which they intended to invest in Opti–Gage and other prospective companies. During the negotiation period, representatives of Ameritrust represented to Walter Cavender that Lich and Auld were wealthy men, who intended to expend substantial sums for the purchase and maintenance of Opti–Gage, as well as other circuit board companies, and that both Lich and Auld were "highly recommended" by Ameritrust's home office in Cleveland.

On March 28, 1989, control of Opti–Gage was transferred from Walter Cavender to Lich and Auld. Numerous documents were executed as part of the transfer:

1) a stock purchase agreement;

2) a consulting agreement wherein Walter Cavender agreed to serve as a consultant;

3) An agreement by Walter Cavender not to compete;

4) A revolving grid note, pursuant to which Ameritrust agreed to lend $1.5 million to Opti–Gage;

5) security agreements giving Ameritrust security interests in Opti–Gage's machinery and equipment, inventory, accounts receivable, and other property;

6) A "Cavender Guaranty" by which the Cavenders guaranteed to Ameritrust a maximum of $400,000 of Opti–Gage's indebtedness and a mortgage on Donna Cavender's property to secure the guaranty;

7) a subordination agreement between the Cavenders and Ameritrust by which the Cavenders agreed to subordinate a balance in excess of $200,000 on a note from Opti–Gage to themselves to the repayment of the $1.5 million indebtedness to Ameritrust.

After closing the purchase transaction, Lich and Auld became officers and directors of Opti–Gage. According to the Cavenders, Lich and Auld, acting both individually and on behalf of Opti–Gage, committed fraud by stripping Opti–Gage of its assets, by removing cash from Opti–Gage in the form of unreasonably high salaries and expenses, by failing to invest additional money in Opti–Gage, and by making false statements concerning their management experience and future plans for the development of Opti–Gage. As a result of these misrepresentations, which formed part of a scheme to deceive and defraud the Cavenders, the Cavenders were induced to part with their property and to guarantee the Ameritrust loan to Opti–Gage. In addition, the Cavenders allege that Lich, Auld, and Opti–Gage have been unjustly enriched to the extent of the loans, stock, and services given by Walter Cavender for which he received nothing in return. Finally, the Cavenders allege that Auld, Lich, and Opti–Gage have committed *prima facie* torts against the Cavenders.

Walter Cavender also alleges in a cross-claim against Lich and Auld only that Lich and Auld, as majority shareholders of more than 75% of the voting shares of Opti–Gage, owed him as a minority shareholder a fiduciary duty to manage Opti–Gage properly and to preserve his interests as a minority shareholder, and that this duty was breached.

Presently before the court is a motion filed by Iain Auld to dismiss the cross-claims of Donna and Walter Cavender against him on the basis that the court lacks subject matter jurisdiction.

## CONCLUSIONS OF LAW

28 U.S.C. § 1334 ("Bankruptcy Cases and Proceedings") contains the jurisdictional provisions regarding bankruptcy cases and reads, in pertinent part, as follows:

(a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

Initially, defendant Auld asserts that in order to successfully join him in the present action under Fed.R.Civ.P. 13(h) "the Cavenders must be able to address and satisfy the issue of 'pendent party jurisdiction'" and that "the Cavenders must set forth an independent jurisdictional basis for the assertion of federal jurisdiction over Auld ..., even though Auld may be called upon to answer claims within the court's ancillary jurisdiction" ("Memorandum in Support of Cross–Claim Defendant Iain Auld's Motion to Dismiss" at p. 9). Neither the authorities cited by Auld nor his memorandum of law explain why it is necessary in the instant proceeding to resort to either ancillary or pendent jurisdiction *prior* to a jurisdictional analysis under 28 U.S.C. § 1334. Bankruptcy jurisdiction is itself an independent basis of federal jurisdiction; therefore, if the court finds that the Cavenders' cross-claims against Auld are "related to" Opti–Gage's bankruptcy, there will exist an independent basis of federal jurisdiction to support the joined claims. *Wood v. Wood (Matter of Wood )*, 825 F.2d 90, 94 (5th Cir.1987). In the event that the Cavenders' cross-claims against Auld are not "related to" Opti–Gage's bankruptcy, then it would be appropriate to explore the subjects of ancillary or pendent jurisdiction. *See, e.g., Petrolia Corp. v. Elam (In re Petrolia Corp.)*, 79 B.R. 686 (Bankr.E.D.Mich.1987).

■ The initial inquiry is whether the Cavenders' cross-claims against Lich, Auld, and Opti–Gage fall within the jurisdictional provisions of 28 U.S.C. § 1334:

For the purpose of determining whether a particular matter falls within bankruptcy jurisdiction, it is not necessary to distinguish between proceedings "arising under", "arising in a case under", or "related to a case under", title 11. These references operate conjunctively to define the scope of jurisdiction. Therefore, it is necessary only to determine whether a matter is at least "related to" the bankruptcy. *Matter of Wood, supra,* 825 F.2d at 93.

More precisely, the issue before this court is whether the cross-claims between the Cavenders and Lich, Auld, and Opti–Gage, are at least "related to" the bankruptcy of Opti–Gage.[3]

No definition of the term "related to" is contained in either the jurisdictional statutes governing bankruptcy nor in the Bankruptcy Code, and differing definitions have been developed by the courts. In this court's circuit, the principal case discussing the scope of bankruptcy jurisdiction and the crucial phrase—"related to"—is *Kelley v. Nodine (In Re Salem Mortgage Co.)*, 783 F.2d 626 (6th Cir.1986). In that case, the Attorney General for the state of Michigan filed suit against five related bankruptcy debtors (which had been consolidated for administration) and eight other defendants, seeking equitable, legal, and declaratory relief under the Michigan Consumer Protection Act. All but two of the corporate defendants had their principal place of business at the same address and all of the individual defendants (five) were officers of corporate defendants located at that address. The major parties in interest negotiated a stipulation for temporary class certification and a proposed final consent judgment, which was presented to the bankruptcy court. The bankruptcy court conditionally approved the proposed consent judgment. However, upon review of the proposed order, the district court raised for the first time the question of whether it possessed subject matter jurisdiction and found that it did not have subject matter jurisdiction under 28 U.S.C. § 1471(b), the statutory predecessor to 28 U.S.C. § 1334(b).

3. This section of the opinion deals only with the cross-claims asserted jointly against Lich, Auld *and* Opti–Gage. The cross-claim of Walter Ca-vender against Lich and Auld only will be dealt with in a subsequent section.

In reversing the district court and finding subject matter jurisdiction, the Sixth Circuit initially observed that Congress intended to create a broad grant of bankruptcy jurisdiction:

The Report filed by the Senate Committee on the Judiciary shows that it shared the House's concerns over the limited jurisdiction of prior law ... and intended, like the House Committee, to make such a broad jurisdictional grant as to "leave no doubt as to the scope of the jurisdiction over disputes to be exercised by the bankruptcy court." The emphatic terms in which the jurisdictional grant is described in the legislative history, and the extraordinarily broad wording of the grant itself, leave us with no doubt that Congress intended to grant to the district courts broad jurisdiction in bankruptcy cases. *Id.* at 633–634.

The court then rejected a narrow interpretation of bankruptcy jurisdiction and adopted a broad articulation of that jurisdiction, although it noted that extremely tenuous connections to a bankruptcy estate would not satisfy the jurisdictional requirements:

Courts have developed different tests in determining whether subject matter jurisdiction exists in a proceeding claimed to be "related to" a particular bankruptcy case. Some courts would find jurisdiction "only where the action clearly involved property of the estate ... or where a determination of the controversy is required for the proper administration or reorganization of the estate...." *In re General Oil Distributors, Inc.,* 21 B.R. 888, 892 n. 13. (Bankr.E.D.N.Y.1982) (citations omitted). Another test finds jurisdiction "whenever 'the outcome of the proceeding could conceivably have *any effect upon the estate* being administered in bankruptcy.'" *Id.* (citing *Mazur v. U.S. Air Duct Corp.,* 8 B.R. 848, 851 (Bankr.N.D.N.Y.1981) (emphasis in original)). Although situations may arise where an extremely tenuous connection to the estate would not satisfy the jurisdictional requirement, we believe that a broader interpretation of the statute more closely reflects the congres-

sional intent in adopting the new bankruptcy laws. *Id.* at 634.

Specifically, the Sixth Circuit found that the dispute in *Salem Mortgage* was sufficiently "related to" the debtors' bankruptcy estates because:

1) the proposed order provided that plaintiff classes would release substantially all claims against the debtors arising from the mortgage transactions;

2) the proposed order provided that the debtors pay civil penalties under the Michigan Consumer Protection Act; and

3) resolution of the dispute would affect the liability of the debtors to investors.

As pointed out by the court in *Haden v. Edwards (In re Edwards),* 100 B.R. 973, 980 n. 11 (Bankr.E.D.Tenn.1989), the Sixth Circuit could arguably have stopped at this juncture in the decision, and jurisdiction could have been "premised solely on the basis that the proposed settlement specified claims against the estate...." However, the Sixth Circuit did not terminate its discussion of jurisdiction at this point, but proceeded to expand upon its jurisdictional pronouncements; that additional commentary, in this court's opinion, has a direct and significant bearing upon the proceeding presently before this court, and was presented in the context of distinguishing *Salem Mortgage* from the important Third Circuit case of *Pacor, Inc. v. Higgins,* 743 F.2d 984 (1984):

In *Pacor,* the plaintiff brought a state court action for work-related exposure to asbestos against the product's supplier. The supplier filed a third-party complaint impleading the original manufacturer. After the manufacturer entered chapter 11 bankruptcy proceedings, the supplier sought to remove the entire controversy to bankruptcy court. The Third Circuit held that the action between the supplier and manufacturer was removable, but that the original action against the supplier was not related to a case in bankruptcy and therefore could not be removed.... In distinguishing *Pacor,* we note that the parties in the mortgage transactions in this proceeding are more

intertwined than the parties in *Pacor.* We also agree with Judge Graves that the statute does not require a finding of definite liability of the estate as a condition precedent to holding an action related to a bankruptcy proceeding. *Id.* [*Matter of Salem Mortg. Co.,* 50 B.R. 34] at 41 [ (Bankr.E.D.Mich.1985) ]. As discussed above, Congress intended a grant of broad jurisdiction under the bankruptcy laws. *In re Salem Mortgage, supra,* 783 F.2d at 634–635.

■ This court, then, reads *Salem Mortgage* as supporting a finding that proceedings are "related to" bankruptcy cases not only where the outcome of the proceeding may conceivably have an effect upon the estate being administered, but also where parties are sufficiently *intertwined* with the debtor.[4]

The case of *Wood v. Wood (Matter of Wood),* 825 F.2d 90 (5th Cir.1987), is illustrative of a finding of bankruptcy jurisdiction under both the "conceivable effect" test and the "intertwining" test. In that case, Dr. James Wood and Dr. Arthur Wood formed a medical corporation, and each became the owner of one-half of the corporation's stock. A few years later, Dr. James Wood and his spouse filed a chapter 11 petition in bankruptcy. Subsequently, Dr. Arthur Wood (a nondebtor) filed a complaint against Dr. and Mrs. James Wood (debtors) and Woodrow Barham (a nondebtor), alleging that the defendants, acting together as directors of the medical corporation, wrongfully issued additional stock to Dr. James Wood, and that Dr. James Wood had received a disproportionate distribution from the clinic as a result of the wrongful stock issuance. With respect to the "conceivable effect" test for bankruptcy jurisdiction, the court observed that:

The plaintiff has filed one complaint against the defendants seeking liability for their joint conduct. Success against any of the defendants will have a poten-

tial effect on the estate. For example, if Dr. Wood and his wife are held liable but Barham is not, the bankrupt estate may bear the entire burden of the judgment. If, on the other hand, Barham is found jointly liable, the estate may bear only a portion of the judgment. 825 F.2d at 94.

The court also noted an additional jurisdictional ground based on the court's reading of *Salem Mortgage:*

Moreover, in filing the complaint, the plaintiff challenged the *combined actions* of both the debtors and Barham, a non-debtor. Resolution of the dispute will necessarily involve, therefore, consideration of Barham's involvement in those actions. We find support in the Court of Appeals for the Sixth Circuit [*In re Salem Mortgage* ] and lower courts, which have held that *when* the *plaintiff alleges liability* resulting from the *joint conduct* of the *debtor and non-debtor defendants, bankruptcy jurisdiction exists* over *all claims under section 1334. Id.* (Emphasis Supplied)

In the instant proceeding, the Cavenders have filed cross-claims against Lich, Auld, and Opti–Gage alleging liability as a result of their joint conduct. As was the case in *Matter of Wood,* if the debtor Opti–Gage is held liable but the nondebtors (Lich and Auld) are not, the debtor's estate may bear the entire burden of any judgment. But if the nondebtors are found jointly liable, the estate may bear only a portion of any judgment. Thus, resolution of the Cavenders' cross-claims may conceivably effect the administration of the debtor's estate, and is, therefore, "related to" the debtor's bankruptcy. As stated by the court in *Matter of Wood,* 825 F.2d at 94, this court acknowledges the possibility that these cross-claims may ultimately have no effect on Opti–Gage's bankruptcy, but the court cannot conclude, on the alleged facts before it, that the cross-claims will have no *conceivable* effect.[5]

---

**4.** *"In re Salem* does not stand for the proposition that the degree to which the parties are intertwined cannot be a basis upon which a proceeding can be determined to be a 'related' proceeding." *In re Edwards, supra,* 100 B.R. at 980 n. 11.

**5.** Ameritrust claims a security interest in all of Opti–Gage's assets. (More correctly, it now claims a security interest in the sale proceeds of those assets.) As a result, it appears that there are no assets to be administered for the benefit of the general creditors of Opti–Gage and, there-

Additionally, in filing their cross-claims and counterclaims, the Cavenders have challenged the combined actions of both the debtor and nondebtors. Therefore, resolution of the dispute will necessarily involve consideration of Auld's and Lich's involvement in those actions. In particular, because Lich and Auld owned the controlling interests of the debtor corporation, were officers and directors of that corporation, are alleged to have conspired to strip the corporation of its assets and to defraud the Cavenders, and it may be significant to distinguish Auld's and Lich's actions in their corporate capacities vis-a-vis their individual capacities, the court finds that Auld is sufficiently intertwined with the debtor to support a finding of bankruptcy jurisdiction.

■ It is important to note that this court is not finding that the Cavenders' cross-claims against Auld, Lich and Opti–Gage are "related to" Opti–Gage's bankruptcy case because of the *existence of common facts.* "[T]he mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not bring the matter within the scope of section [1334(b) ]." *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3rd Cir.1984). In other words, a factual nexus between a civil proceeding and a bankruptcy case is in and of itself insufficient to confer bankruptcy jurisdiction upon a court. *Hoffman v. Roberto,* 85 B.R. 417, 421 (W.D.Mich.1988). With respect to the "intertwining" test,[6] then, it is the degree to which the parties (Lich, Auld, and the debtor, Opti–Gage) are intertwined that supports a finding of jurisdiction. Unfortunately, it is impossible to precisely define when parties are sufficiently intertwined with the debtor to find bank-

ruptcy jurisdiction, but the court believes that the factors listed in the preceding paragraph are sufficient to support jurisdiction for the cross-claims filed jointly against Auld, Lich, and Opti–Gage.

## CROSS–CLAIM OF WALTER CAVENDER AGAINST LICH AND AULD

■ A different result is reached with respect to Walter Cavender's separate cross-claim against Lich and Auld only, wherein it is alleged that Lich and Auld, as majority shareholders, have breached a duty owed to Walter Cavender as a minority shareholder. The court finds that resolution of this cross-claim has no conceivable effect on the bankruptcy estate of Opti–Gage. No monetary award is being sought from Opti–Gage, it is not alleged that Opti–Gage is ultimately responsible for any damages under this cross-claim, and determination of the cross-claim does not adjust any rights or liabilities of Opti–Gage. In addition, the cross-claim is for the alleged conduct of Lich and Auld and does not concern the joint conduct of Opti–Gage, Auld, and Lich; thus, in regard to this cross-claim, the debtor is not intertwined with Lich and Auld.

It may be that either ancillary or pendent jurisdiction is available for the court to decide the cross-claim against Lich and Auld. However, the burden of demonstrating such jurisdiction is upon Walter Covender and he has not done so; instead, he has stated in a memorandum of law (Doc. # 44 at p. 7–8) that the "concept of pendent jurisdiction is simply irrelevant." In view of the complexity of the jurisdictional issues in this proceeding, the court will not yet dismiss the cross-claim against Auld

---

fore, it is impossible for the Cavender's cross-claims to have any effect on the administration of Opti–Gage's bankruptcy estate. *See, e.g., First State Bank of Wykoff v. Grell (In re Grell),* 83 B.R. 652, 658 (Bankr.Minn.1988) (adjustment of a bank's claim against a guarantor is irrelevant to case administration in a chapter 7 no-asset case that will always remain a no-asset case). However, the Cavenders have filed a counterclaim against Ameritrust asserting that all claims of Ameritrust against Opti–Gage should be subordinated to the claims of the Cavenders

under principles of equitable subordination, which are codified in § 510 of the Bankruptcy Code. Thus, it is conceivable that—if the Cavenders are successful in their subordination request—their cross-claims may have an effect on the administration of the bankruptcy estate.

**6.** As noted, the cross-claims against Auld, Lich, and Opti–Gage also satisfy the "conceivable effect" test.

and Lich. Instead, an opportunity will be granted to both Walter Cavender and Auld to provide additional legal authority regarding ancillary or pendent jurisdiction of the cross-claim against Lich and Auld.

## DISTINGUISHING THE CASES RELIED UPON BY AULD

Defendant Auld relies on *Diaconx Corporation v. Hamilton Bank (In re Diaconx Corporation)*, 65 B.R. 139 (E.D.Pa. 1986), to support his contention that the Cavenders' cross-claims[7] against him have no conceivable effect upon the bankruptcy estate of Opti–Gage. In that case, a complaint was filed by a chapter 11 corporate debtor and its president, who was also the corporation's majority shareholder and a guarantor of loans from the defendant bank. The court dismissed the president's claim against the defendant bank for lack of subject matter jurisdiction because it failed to satisfy the "conceivable effect" test:

> [T]he result of [the president's] individual claims will in no way affect the bankrupt estate of the debtor. If [the president's] claims are successful the award would inure to him personally and would not become part of the bankrupt estate. If [the president's] claims are unsuccessful, the bankruptcy estate also remains unaffected. *Id.*, 65 B.R. at 140.

■ In the instant proceeding, it is true that any award with respect to the Cavenders' claims against Auld would inure only to them and not to the bankruptcy estate of Opti–Gage; however, to whom the benefit of a claim inures is not the only conceivable effect of a claim that is examined. Here, the debtor is a third-party defendant and not a plaintiff as in *Diaconx*. Therefore, as discussed above, the *debtor's liability* to the Cavenders may vary, depending on resolution of the Cavenders' claims against other third-party defendants. Thus, the Cavenders' claims against Auld may have an effect on the debtor's bankruptcy estate, despite the fact that award would be

granted solely to the Cavenders. Again, the important question is whether the claim has an effect on the *debtor's estate*, not to whom an award or damages may be made. In addition, this court has found bankruptcy jurisdiction on the basis of the intertwining of the parties and that subject is not addressed by the *Diaconx* decision.

Defendant Auld also cites *Maislin Industries, U.S., Inc. v. Certified Brokerage Sys., Inc. (In re Maislin Industries, U.S., Inc.)*, 75 B.R. 170 (Bankr.E.D.Mich.1987), which involved a creditor, who was the subject of a debtor's adversary proceeding, bringing a third-party complaint for indemnity. The court found that the proceeding was not "related to" the debtor's bankruptcy case, because the creditor's liability to the debtor was unaffected by any action the creditor might take with respect to the third-party defendant regarding indemnity. In the instant case, there is no claim for indemnity against Auld by the Cavenders; rather, it is the matter of potential joint liability of the debtor's estate and Auld that renders the cross-claim against Auld "related to" Opti–Gage's bankruptcy. In addition, *Maislin* did not involve intertwined parties.

■ In conclusion, the court notes that this type of case is probably very near the outer boundaries of bankruptcy jurisdiction. As a general matter, this court is of the view that bankruptcy courts "ought not to be drawn into determining disputes between third parties, the resolution of which will not advance the administration of the bankruptcy case pending before it." *Kaiser Steel Corp. v. Frates (In re Kaiser Steel Corp.)*, 95 B.R. 782, 791 (Bankr.D. Colo.1989). When a claim to be adjudicated is between third parties, there is at least a signal that subject matter jurisdiction may be lacking. However, merely designating parties as nondebtors or third parties does not *per se* provide the answer to whether the requisite jurisdiction is present. Instead, a functional analysis of the relationship between the claim and the bankruptcy

---

7. This section of the opinion also deals only with the Cavenders' cross-claims against Lich, Auld *and* Opti–Gage. Walter Cavender's cross-

claim against Lich and Auld is not addressed here.

estate must be performed, i.e., could resolution of the claim conceivably have any effect upon the estate being administered in bankruptcy? In addition, as discussed above, this court reads *Salem Mortgage* as saying that where parties are sufficiently intertwined with the debtor, claims involving the joint conduct of the debtor and nondebtor defendants will be "related to" the debtor's bankruptcy case.

For the foregoing reasons, it is therefore ORDERED that the motion of Iain Auld to dismiss the cross-claims of Donna Cavender and Walter Cavender is DENIED. It is further ORDERED that Walter Cavender file a supplemental memorandum of law regarding ancillary or pendent jurisdiction for the cross-claim against Auld and Lich by *Thursday, May 2, 1991*, and that Iain Auld file his response by *Monday, June 3, 1991.*